UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MOLIERE ELIZE,

               Petitioner,

                                        **MEMORANDUM & ORDER**
        - against -                      02-CV-1350 (NGG)

UNITED STATES,

               Respondent.
----------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Petitioner pro se Moliere Elize ("Elize") moves the court pursuant to 28 U.S.C. §2255 to

vacate his conviction on various charges relating to the smuggling of cocaine into the United

States. For the reasons set forth below, Petitioner's motion is DENIED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

      On March 13, 1999, Elize arrived at New York's John F. Kennedy International Airport

("JFK") on American Airlines flight 658 from Port-au-Prince, Haiti. Upon his arrival, United

States Customs Service ("Customs") agents detained him as part of an investigation into a

cocaine-filled suitcase found on board his flight. Elize was subsequently indicted on charges of

conspiracy to import cocaine, conspiracy to possess cocaine with intent to distribute, and

possession of cocaine on an aircraft entering the United States, in violation of 21 U.S.C. §§ 963,

846, and 955. (Government's Letter Brief in Response to Elize's Petition ("Government's

Brief") (Docket Entry #7) at 1.)

### A.    Elize's **Cursio** Hearing

      On October 22, 1999, Judge Eugene H. Nickerson ("Judge Nickerson") held a Cursio

1

hearing to determine whether Elize would retain his counsel, Lawrence Kerben ("Kerben"). Kerben had been present at several of Elize's proffer sessions with the Government. (Government's Brief at 2.) Elize therefore had to understand that should Kerben continue to represent him, he would not be able to call Kerben to testify on his own behalf, even if such testimony might support his defense.[1] (Id. at 6.) Elize stated at the hearing that he wished to keep Kerben as his attorney even though he understood that he could retain another attorney and therefore preserve his ability to call Kerben as a witness.

Cursio counsel David Secular ("Secular") stated at the hearing that a Creole-speaking interpreter assisted Elize during their discussions leading up to the Cursio hearing. (Cursio Tr. at 2.) At no point during the Cursio hearing was Elize told he could not testify at his trial, and at no point did he indicate whether or not he intended to testify at trial.

### B.    Elize's Pre-Trial Suppression Hearing

On October 27, 1999, Judge Nickerson held a suppression hearing to determine whether Elize's confession that he brought on board the drug-filled suitcase could properly be admitted into evidence. Testifying at the hearing were Peter Amentas, a senior special Customs agent, Jean Louis Touillon, an international security agent with American Airlines, and Elize. The hearing focused on Elize's ability to understand and respond to the reading of his rights and subsequent questioning during his detention at JFK on March 13, 1999.

Amentas testified that before he questioned Elize, Elize stated that he spoke "Haitian."

---

[1]  Cursio counsel David Secular noted at the hearing that he had requested and received assurance from the Government that "given the fact that this all occurred at a proffer session, [and that] there is no attorney-client privilege . . . that under no circumstances would the government feel that there was a reason to call Mr. Kerben [as a witness] if Mr. Kerben remains as trial counsel." (Id. at 5.)

(Suppression Hearing Tr. at 30.) Amentas then said that he and Elize proceeded to converse in English, and Amentas read Elize his <u>Miranda</u> rights in English. (<u>Id.</u> at 26-29.) Amentas testified that each time he finished reading aloud to Elize a paragraph of the <u>Miranda</u> warning, Amentas asked, "Do you understand," and Elize responded affirmatively. (<u>Id.</u> at 27-28.) Noting Elize's accent and seeking to avoid any chance of miscommunication, Amentas sought to "err on the side of being conservative and . . . ask for an interpreter to come in" to restate Elize's rights in French or Creole. (<u>Id.</u> at 29-30.) Amentas stated that he questioned Elize for approximately half an hour before the interpreter arrived (<u>id.</u> at 33), at no point during which did Elize indicate "that he did not understand what was going on" (<u>id.</u> at 10). Amentas testified that once the interpreter (Touillon) arrived, "Mr. Elize was responding in both the French and English language." (<u>Id.</u> at 32.)

Elize consistently denied knowledge or possession of the cocaine-filled suitcase until Amentas said that he was going to take Elize's fingerprints, then take latent fingerprints from the suitcase, and "attempt to match those prints on the bag with Mr. Elize's fingerprints." (<u>Id.</u> at 11.) Amentas testified that at that point:

> Mr. Elize indicated to me that, in fact, he did carry that bag, that bag was in fact his and that he did, in fact, bring that bag on board the aircraft. Upon further questioning, Mr. Elize indicated to me that he knew that that bag did contain narcotics and that he had been recruited to smuggle that bag into the United States.

(<u>Id.</u> at 12.) Elize went on to confess that he had been instructed to wear certain clothing so that he could be "readily identified" upon arriving at JFK. (<u>Id.</u>) Elize told Amentas that upon arriving at the terminal, "he was going to be met" by someone who "was working in conspiracy with his organization" and would "remove him from the terminal, circumventing the immigration

3

and the customs inspection." (Id. at 12-13.) Amentas testified that Elize told him that he was frightened by an unexpected gate change upon arrival at JFK, so he chose to leave the suitcase on the airplane and to walk through customs without any baggage. (Id. at 13.)

The interpreter Amentas obtained, Jean Louis Touillon ("Touillon"), was from Paris, France but had resided in New York City for fifteen years at the time that he was called upon to translate for Elize. (Id. at 34-35.) Touillon worked as an international security agent with American Airlines. (Id. at 35.) Touillon testified that he was asked "to translate the rights to this person [Elize] in French. The person was speaking French and understanding me." (Id. at 38.) Although Touillon noted that, when questioning Elize, he often had to repeat or rephrase questions, he insisted that Elize "was understanding exactly what I was saying, but he was coming back to the same answer, like he didn't want to answer the question."[2] (Id. at 46.)

Touillon, who was not trained or licensed to act as an interpreter (id. at 54), stated that his translated interview of Elize lasted "a few hours," an estimate he arrived at because "I left a long time after my shift." (Id. at 39-40.) The Government asked Touillon to interpret handwritten words on some pieces of paper found among Elize's belongings on March 13, 1999. (Id. at 42.) Touillon attempted somewhat successfully to translate the words but, as they were a mixture of French and Creole, he could not entirely divine their meaning. (Id. at 42-43.)

Following Touillon's testimony, Kerben argued that the government had not met its burden to show that Elize understood his rights. (Id. at 57-58.) The Government countered that Elize consistently expressed his understanding of both French and English and at "at no point . . .

---

[2] Touillon later reiterated that Elize perfectly understood his French translation, but the interview "took so long" because "he was trying not to answer the question I was asking him." (Pre-Trial Hearing Tr. at 55.)

4

said I want to stop, I can't understand you, I want a Creole interpreter." (Id. at 58-59.) The Court chose to deny Kerben's motion, stating, "I believe the government witness, unless you want to put the defendant on the stand." (Id. at 59.)

Elize then testified, with the assistance of a Creole-speaking interpreter, and stated that he understood neither English nor French, only Creole. (Id.) Elize stated that during the course of the interview (which lasted "a long time,") he signed one paper, "a letter that I must call a doctor." (Id.) Elize said that he never talked to any agents who questioned him other than to state, in Creole, that he was Haitian and that he had never been read his rights. (Id. at 60-61.) He testified that he knew only a few English words, *e.g.*, yes, no, momma, papa. (Id. at 62.) In response to the Government's questioning, Elize stated that he had lived in the United States for five years, that he worked in a Florida restaurant where "no one has ever spoken to [him] in English," and that he could not recall how many times he had visited Haiti in the past year, stating, "I don't remember exactly. I always travel . . . [and I take] many trips [there]." (Id. at 65-66.)

Elize testified that he had attended high school until the tenth grade, when he was 19. (Id. at 67.) The Assistant United States Attorney ("AUSA") asked whether Elize took any French classes in school, and Elize responded that Haitian schools provide documents written in French but that "over there they don't speak French." (Id.) The AUSA rephrased his question and asked, "If I pulled your school records from the files of the school that you went to for your entire school career, would I find that you took classes in French?" (Id. at 68.) Elize replied, "The school will give you the documents in French," at which point the judge interjected, "You are not going to get an answer. He doesn't want to answer the question . . . The motion is

5

denied." (Id.)

### C.     Elize's Trial

On November 29, 1999, Elize's three-day trial commenced. JFK Customs agent Jennifer Sette ("Sette"), who first intercepted Elize at the JFK, testified that Elize communicated with her in English and appeared to understand her questions about his deplaning without baggage. (Trial Tr. at 35.) Customs Inspector Sandor Ribar explained how he found the unclaimed suitcase that lacked luggage tags or identification information. (Id. at 40-48.) Noel Vadell, a forensic chemist at the Drug Enforcement Administration, testified that he tested the substance found in the suitcase and confirmed that it was cocaine. (Id. at 57.)

Touillon testified again that Elize "said yes, I speak French," that he successfully read Elize his rights, that Elize fully understood them, that he interviewed Elize in French during his post-flight detention, and that he felt Elize was evasive in answering the questions posed to him about his possession of the suitcase. (Id. at 62-69.) Touillon stated that although Elize first denied that the suitcase "belong[ed] to him," after fifteen minutes of questioning Elize admitted that "the bag is mine." (Id. at 63-64.) Citing confusion about how many people he had interviewed the evening of Elize's detention, Touillon stated that his interview with Elize lasted approximately half an hour, as opposed to his pre-trial hearing statement that the interview had spanned "a few hours." (Id. at 64, 66-67.) Referring to another Haitian who had been detained concurrently with Elize, Touillon stated, "I thought at the time there was just one person when I interview, but I told you two people, and I finished all my interview at 1:20 in the morning. In my recollection I thought it was just one person. I – in fact, there was two." (Id. at 66-67.)

Amentas testified that he asked Elize whether he spoke English and that Elize "responded

to me that yes, he did speak English." (Id. at 81.) Amentas stated that he read Elize the <u>Miranda</u> warning in English, that Elize affirmatively expressed his understanding of each paragraph of the warning, and that, out of caution, he chose to have an interpreter apprise Elize of his <u>Miranda</u> rights in French. (Id. at 81-83.) Amentas further noted that when he threatened to take Elize's fingerprints and to attempt to match them to "prints off the bag," Elize then "did admit that, in fact, the bag was his," that he knew that there were narcotics in the bag, and that he intended upon deplaning to meet someone who would "get him out of the jetway . . . circumventing the immigration and customs inspection process." (Id. at 86-88.) On cross-examination, Kerben elicited that Customs agents are supposed to "memorialize" all detainee interviews; Amentas stated that he had performed a sufficient memorialization by reporting the interview details to Richard Klugman ("Klugman"), another Customs special agent. (Id. at 96.) Amentas admitted under Kerben's aggressive questioning that he had not seen Elize sign a "<u>Miranda</u> form" and had never seen a copy of such a signed form, but he insisted that Elize had signed the form at some point "subsequent[]" to the interview. (Id. at 97-98.)

Robert Jaeger ("Jaeger"), a forensic investigator with the New York Police Department, stated that he tested the suitcase for fingerprints and found none. (Id. at 105-106.) He also testified that, for fingerprint-collecting purposes, the suitcase had a "very poor surface. It is a cloth surface. It is a fabric, and you are not going to leave a print on the fabric." (Id. at 105.) Asked if he was surprised to find no fingerprints on the suitcase, Jaeger responded, "Not at all." (Id. at 105-06.)

Finally, Klugman testified that during Elize's detention he had also conversed with Elize in English. (Id. at 115.) Elize told Klugman that although he was supposed to meet someone on

7

deplaning to help him circumvent Customs, he left the suitcase on the airplane when he grew

frightened of getting caught with it. (Id.) Klugman also identified several Government exhibits

including Elize's plane tickets, driver's license, and two papers featuring English-language

driving instructions to a Miami location that were "found with the defendant . . . [o]n Mr. Elize's

person." (Id. at 119-21.) Over Kerben's objection, Klugman read aloud from both papers. From

Government Exhibit 9, he read, "From the house going to MacNab going east, turn right. . . . On

31st Avenue right ahead to Broward Boulevard. Turn left on Broward going east . . ." (Id. at

120.) Klugman then read aloud Government Exhibit 10: "From here pick up I95 going south to

Miami Avenue exit . . . Then go right on 13th Street. Keep going. Then you will see the Haitian

flags on your right-hand side." (Id. at 120-21.)

Following Klugman's testimony, Kerben moved to dismiss the conspiracy counts against

Elize on the ground that the Government "[had] not proved a conspiracy." (Id. at 124.) The

Government countered that the testimony relating to Elize's own statements "clearly show[ed]

there was a plan . . . and that he was not operating alone." (Id.) Judge Nickerson overruled

Kerben's motion and then addressed Elize directly, offering him the opportunity to take the

stand, which Elize declined to do. (Id. at 125.)

On December 1, 1999, a jury convicted Elize on all of the Government's counts. On

September 22, 2000, Judge Nickerson sentenced Elize to 120 months imprisonment and five

years supervised release.

### D.    Elize's Appeal and Habeas Petition

Elize appealed his conviction to the Second Circuit, arguing that the district court 1)

improperly refused to dismiss the conspiracy counts due to insufficient evidence; 2) improperly

instructed the jury on the law of conspiracy; and 3) erred in failing to disclose to the jury what language the court interpreter was speaking to Elize throughout the trial. (Government's Brief at 2.) By summary order dated October 11, 2001, the Second Circuit affirmed Elize's conviction and sentence. United States v. Elize, 22 Fed. Appx. 42 (2d Cir. 2001).

On February 15, 2002, Elize filed this petition for habeas corpus, arguing ineffective assistance of counsel. (28 U.S.C. § 2255 Petition ("Petition") (Docket Entry #1) at 1.) Elize argues that he speaks only Creole and does not speak, read, or write French or English. (Id. at 2.) Elize claims that his trial counsel, who did not speak Creole, was ineffective because no Creole interpreter was present "during numerous conversations which occurred between defense counsel and Mr. Elize" prior to, during, and after the conclusion of his trial. (Id. at 2-3.) Elize further objects to his trial counsel's failure to provide him numerous documents translated into either French or Creole or to read these documents to him in French or Creole. (Id. at 3.)

Elize's second claim of ineffective assistance of counsel charges that his appellate counsel failed to adequately challenge the admissibility of his confession. (Id.) Elize argues that his appellate counsel should have appealed the trial court's denial of both his suppression motion concerning his inculpatory statements and his motion for a new trial pursuant to Fed. R. Crim. P. 33. (Id.)

Elize also claims that his trial counsel failed to put forth "any defense at all." (Id. at 5.) Among many complaints discussed in greater detail, *infra*, he argues that Kerben failed to "investigate and/or challenge" the Government's fingerprint evidence and to call witnesses with exculpatory evidence or information. (Id.)

9

## II.    DISCUSSION

### A.    Legal Standard and Procedural Default

Under 28 U.S.C. § 2255, a court may "vacate, set aside or correct" a conviction or sentence "imposed in violation of the Constitution or laws of the United States." Petitions for habeas corpus relief that collaterally attack final judgments are in "tension with society's strong interest in the finality of criminal convictions, [so] the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995), abrogated on other grounds by Mickens v. Taylor, 535 U.S. 162 (2002); see also United States v. Frady, 456 U.S. 152, 165 (1982) ("[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.") (internal citation omitted). Claims raised in a §2255 habeas petition that could have been raised on direct appeal are therefore generally deemed procedurally defaulted and are not considered on collateral review.

A claim of ineffective assistance of counsel is generally exempted from the procedural default rule. Massaro v. United States, 538 U.S. 500, 504 (2003) ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under §2255, whether or not the petitioner could have raised the claim on direct appeal."). This permissive attitude reflects courts' recognition that ineffective assistance of counsel claims are often not clear from the trial record. Massaro, 538 U.S. at 502-03. Further, trial counsel who goes on to represent a defendant on direct appeal has little, if any, incentive to point out his or her own ineffectiveness. Id.

In its brief, the Government claims that Elize's petition alleging ineffective assistance of

10

counsel is procedurally barred because the "complaint about the adequacy of his trial counsel's suppression attempt . . . is based completely on the trial record, the suppression issue was not raised on appeal, and he was represented by different counsel on appeal." (Government's Brief at 4.) The Government relies on Abbamonte v. United States, 160 F.3d 922, 925 (2d Cir. 1998), wherein the Second Circuit, quoting its previous opinion in Billy-Eko v. United States, 8 F.3d 111 (2d Cir. 1993), held that a §2255 petitioner must "show cause and prejudice for not raising the ineffective assistance claim on direct appeal only if . . . '1) the petitioner was represented by new appellate counsel at direct appeal, and 2) the claim is based solely on the record developed at trial.'" Abbamonte, 160 F.3d at 925. The Government further asserts that both of these conditions apply to Elize's case. (Government's Brief at 4.) However, the Second Circuit's Billy-Eko standard has since been explicitly abrogated by the United States Supreme Court's decision in Massaro, in which Justice Kennedy wrote for a unanimous court that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255." Massaro, 538 U.S. at 509. Elize's petition is thus not procedurally barred.

In order to succeed on a claim of ineffective assistance of counsel, a petitioner must first show that "counsel's performance was deficient," that is, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). Second, "the defendant must show that the deficient performance prejudiced the defense . . . [and produced] errors . . . so serious as to deprive the defendant of a . . . trial whose result is reliable." Id.

Courts conducting a performance inquiry should consider "whether counsel's assistance

was reasonable considering all the circumstances," and should operate with a strong presumption

that counsel rendered effective representation. Id. at 688, 690.

When conducting a prejudice inquiry, courts should keep in mind that:

> [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."

Id. at 696. Additionally, "speculative assertions of bias or prejudice" cannot satisfy the burden of

proof a petitioner must meet to show prejudice. Triana v. United States, 205 F.3d 36, 41 (2d Cir.

2000).

### B. Elize's Claims

#### 1. Whether Trial Counsel's Failure to Provide Non-Trial Interpretive Aid Constituted Ineffective Assistance

Elize claims that he was deprived of a fair trial because Kerben could not converse with

him in many "tenuous" attorney-client meetings and because Kerben failed to provide Elize with

court documents in French or Creole. (Petition at 2-3.) A defendant has a right to "consult with

his lawyer with a reasonable degree of rational understanding." United States v. Negron, 434

F.2d 386 (2d Cir. 1970) (quoting Dusky v. United States, 362 U.S. 402 (1962)). The court in

Negron held that the defendant, who spoke only Spanish, was entitled to an interpreter's

assistance throughout the course of his trial. Id.

When a defendant is clearly able to communicate in a given language, however, he cannot

sustain claims protesting that his was trial was unfair because of a language barrier. See Negron,

434 F.2d at 391. In Gonzalez v. People of the Virgin Islands, 109 F.2d 215 (3rd Cir. 1940), for

example, the court rejected defendants' claims that they could not speak English, noting that:

> [I]n the case before us it does not appear from the record that the defendants were unable to speak or understand English, the language of the People's witnesses. On the contrary it does appear that both of them had resided in an English speaking community for a considerable period, one of them . . . kept a store in that community for over eight years, and that shortly after the [alleged arson] they each gave statements in English to the chief of police. . . . The ignorance of English they now profess thus seems highly improbable......................................................................

109 F.2d at 217.

Elize, whose ability to understand French and English was established at the pre-trial suppression hearing, does not demonstrate any disability borne of a language barrier. At the time of his capture, Elize had resided and worked in the United States for six years. (Suppression Hearing Tr. at 64.) Like the defendant in Gonzalez, he "had resided in an English speaking community for a considerable period." His claim at the pre-trial suppression hearing that no one, over the course of his time working in the United States, had ever spoken English to him is not credible. Elize was found with English-language notes on his person, containing detailed instructions directing their carrier, a Haitian, to drive to a Haitian-flag marked destination. (Trial Tr. at 120-21). Most critically, by the account of numerous Government witnesses, Elize communicated effectively in both English and French.[3] When Elize *was* assisted by a Creole-speaking interpreter, i.e., at all court proceedings and at pre-Cursio hearing meetings with Secular, he never articulated any problems communicating with Kerben. In fact, when provided with an opportunity to retain a different attorney at his Cursio hearing, Elize adamantly maintained that he wished Kerben to continue to represent him, strongly indicating a satisfactory

---

[3] Amentas, Klugman, and Sette all testified that Elize communicated with them effectively in English. Touillon testified that Elize communicated with him effectively in French.

13

relationship. (Cursio Tr. at 6.) For all of these reasons, Elize's protestation that he could only speak Creole, and that he could not contribute meaningfully to his own defense, is simply not credible.[4]

### 2. Whether Trial Counsel's Failure to Provide Creole-language Documents Constituted Ineffective Assistance

Elize objects that his trial counsel did not provide him with court documents translated into Creole. He claims that he was not provided with translated versions of numerous documents including: the indictment, letters from defense counsel, letters from the court, letters from the Government to defense counsel, the superseding indictment, the motion for new trial, the briefs filed on direct appeal, the decision of the Court of Appeals, his appellate counsel's motion to be relieved, and the instructions on seeking certiorari pro se in the event counsel is relieved. (Petition at 3.)

Courts have determined that the failure to provide a defendant with written translations of court documents does not violate a petitioner's right to a fair trial when he is provided with an interpreter at court appearances and could effectively communicate with his attorney in private meetings. Sanders v. United States, 130 F. Supp. 2d 447, 449 (S.D.N.Y. 2001)

Elize, arguing that his inability to access court documents in French or Creole rendered his trial fundamentally unfair, relies upon United States v. Mosquera, 816 F. Supp. 168

---

[4] I note that on page 3 of his Petition, Elize protests that he was not provided court documents to review "in either French or the Creole Dialect of the French language. . ." Similarly, Elize complains on page 2 of his Petition that his trial counsel neither spoke nor understood "French of the Creole Dialect of the French language." Elize's call for documents and communication in French, when elsewhere in his Petition he maintains that he speaks no French, further supports the conclusion that Elize's claim that he speaks only Creole is not credible.

(E.D.N.Y. 1993). In Mosquera, the court held that all eighteen of the non-English speaking

defendants "in the present case" had to be provided Spanish-language copies of, among other

documents, their indictments, statutory provisions related to their indictments, written plea

agreements, and presentence reports. Mosquera, 816 F. Supp. at 177. In Sanders, however, the

court noted that in Mosquera the government had to "provide separate interpreters and written

translations . . . to 18 defendants in a complex narcotics and money laundering prosecutions."

130 F. Supp. 2d at 449. The Sanders court continued, "the facts of [that] case were exceptional,

and courts have since limited the case to its facts." Id.

The Government's prosecution of Elize was not so complex as to demand the provision

of documents as required in Mosquera. Additionally, Elize has already been shown to have

communicated competently in English and French. Furthermore, even if Kerben's failure to

provide translated court documents *was* erroneous, Elize fails to show the prejudice required by

Strickland that resulted from not having translated documents. Elize identifies no document

which he might have exploited to his advantage in order to turn the tide of the case against him.

The argument that receiving any documents in Creole might have made a difference is wholly

speculative and therefore insufficient to show that Elize suffered prejudice. See Triana, 205 F.

3d at 41.

### 3.     *Whether Elize's Cursio Hearing Violated His Right to a Fair Trial*

Elize argues that Secular, his Cursio counsel, erred by "inform[ing] the court that Mr.

Elize wished to continue with his trial counsel, and therefore, that [Elize] was required to waive

testifying in his own defense."[5] (Petition at 6.) Elize argues that by making this statement in open court, Secular improperly revealed Elize's trial strategy to the Government. (Id. at 6-7.) Yet, by deciding to keep Kerben as trial counsel, Elize was not required to and never "waived" the right to testify in his own defense. Secular merely noted in open court that should Elize choose to testify at trial, as he was entitled to do, Kerben could not "be a witness to corroborate or to assist Mr. Elize's position as to what transpired at the proffer session."[6] (Cursio Tr. at 3.)

In sum, as Elize never indicated whether or not he would testify, no trial strategy was disclosed to the Government. Rather, all that happened at the Cursio hearing was that Secular and the court provided necessary instruction to Elize regarding a potential conflict of interest that might affect him at trial. Elize's complaint about an unfair Cursio hearing is therefore without merit.

### 4. Elize's Fifth Amendment Rights

Elize asserts that because he decided not to testify, jurors drew negative inferences from

---

[5] A Creole-speaking interpreter assisted Elize at the Cursio hearing and at meetings between Elize and Secular (Cursio Tr. at 2). Elize alleges in his Petition that these interviews were attended by a French-speaking-only interpreter, yet when asked at the Cursio hearing (through a Creole-speaking interpreter) whether he understood "everything that Mr. Secular said when he talked to you," Elize replied, "Yes." (Id. at 6.) The issue of Elize's language comprehension has already been addressed, but it is worth emphasizing that Elize clearly understood (and, in court, affirmed his understanding of) the nature and outcome of the Cursio discussion at the time of the hearing and in meetings leading up to it.

[6] Elize further mischaracterizes the record when he argues that "it was discovered" that should he testify at trial Kerben "would more than likely become a witness" because Kerben had been present during proffer sessions. (Petition at 6.) Secular sought and received assurance from the Government that it would not attempt to elicit at trial that Kerben was present at any proffer sessions and that it would not call Kerben as a witness. (Cursio Tr. at 5.) The court interjected "I'm sure they wouldn't do that," and the Goverment's attorney replied, "That is not our plan, your Honor." (Id.)

his silence. (Petition at 8.) Judge Nickerson explicitly instructed the jury before its deliberation to "drawn no inference whatsoever from the fact that the defendant did not take the witness stand. You must not consider the fact that the defendant did not testify." (Judge's Charge at 26.) Elize argues that the jurors disregarded Judge Nickerson's instruction to them to draw no negative inferences from his decision not to testify.

Jurors are presumed to have followed the instructions they were provided. See United States v. Snype, 441 F.3d 119, 129-130 (2d Cir. 2006). This presumption may "evaporate[ ] where there is an overwhelming probability that the jury will be unable to follow' a limiting instruction that demands mental acrobatics of the jurors." Id. at 130 (internal citation omitted). Here, Judge Nickerson issued a simple, accurate, and appropriate instruction to the jurors. Presuming, per Snype, that the jurors followed their instruction, Elize cannot claim prejudice arising from his failure to testify.

5.   *Whether Trial Counsel Failed to Present a Defense and to Appropriately Challenge Evidence Against Elize*

In allegations spread throughout his Petition, Elize attacks Kerben's trial strategy as inadequate because Kerben failed to "provide easily available mitigating evidence . . ." (Petition at 13.) Elize alleges that his trial counsel 1) failed to investigate or challenge fingerprint evidence about the suitcase "by engaging his own expert to support the defense position that Mr. Elize was not the owner or bearer of the subject suitcase" (emphasis in original) (id. at 5); 2) failed to "interview or subpoena the airline personnel who interacted with [him] in Haiti as well as during the flight" who might remember he brought no suitcase on board (id.); 3) failed to subpoena airline "video surveillance tapes" that might show he didn't bring the cocaine-filled

suitcase on the plane (id.); 4) failed to investigate whether JFK officials regularly provided certified interpreters "for the languages relevant to the . . . arriving flights" (id.); 5) failed to call Elize's family members to testify that he always traveled without luggage (id. at 13); 6) failed to cross-examine Sette to challenge her assertion that she communicated effectively with Elize in English (id. at 14); 7) failed to object to the admission of the suitcase as evidence (id.); and 8) failed to object to a statement by the court that suggested that Elize preferred, as opposed to required, the presence of an interpreter (id.).

Any of these tactics might have been an element of a reasonable, effective trial strategy. Yet Elize fails to present a cogent argument that any or all of them might have changed the outcome of his trial, given the overwhelming evidence of his guilt, namely his March 13, 1999 confession attested to at trial by three separate witnesses – Touillon, Amentas, and Klugman.

In the face of this evidence of his guilt, Elize's contentions about ineffective assistance are too speculative to be credible. See Triana, 205 F.3d at 41. For example, Elize provides no evidence that any specific videotape exists that proves his innocence; rather, he argues only that Kerben should have found such a tape. Likewise, while Elize argues that Kerben should have called Port-au-Prince check-in and boarding personnel, security personnel, first-class lounge staff, flight attendants, and passport control officers to testify that he did not board the plane with luggage, he does not demonstrate that any particular person would have so testified. The remainder of Elize's claims are similarly too speculative to overcome the burden he faces in showing that he suffered prejudice as a result of Kerben's representation.

18

*6. Whether Appellate Counsel Was Ineffective for Failing to Appeal the District Court's Denial of Elize's Motion to Suppress and Motion for a New Trial*

Elize claims his appellate counsel provided ineffective assistance for failing to appeal the trial court's denial of both the pre-trial motion to suppress his confession and the Rule 33 motion for a new trial.[7]

The <u>Strickland</u> test for ineffective assistance of counsel also applies to claims of ineffective assistance of appellate counsel. <u>Clark v. Stinson</u>, 214 F.3d 315, 321 (2d Cir. 2000). Bearing in mind the strong presumption of counsel's effective representation, Elize must demonstrate that his appellate counsel's performance falls outside "the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. A claim of ineffective assistance of appellate counsel is not sustained by a habeas petitioner's showing that appellate counsel "omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." <u>Cuoco v. United States</u>, 208 F.3d 27, 32 (2d Cir. 2000) (<u>quoting</u> <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994) (internal quotation marks omitted)). Appellate counsel is due substantial deference as she "winnow[s] out weaker arguments on appeal and focus[es] on those more likely to prevail, [methods that] far from being evidence of incompetence [are] the hallmark of effective appellate advocacy." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 317 (2d Cir. 2001) (<u>quoting</u> <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986)

---

[7] Throughout his petition, Elize also alleges that his appellate counsel failed to "recognize and brief" a number of wrongs including 1) "the entire language issue" (Petition at 4); 2) that Government witnesses were lying (<u>id.</u>); and 3) that he should not have been forbidden to testify in his trial (<u>id.</u> at 8). The first and third of these issues have already been addressed, *supra*; the second, given the weight of the evidence to the contrary and absent any supporting evidence, is frivolous.

(internal quotation marks omitted)).

Elize argues that his appellate counsel was ineffective for failing to appeal the district court's denial of his suppression motion and his motion for a new trial, but precedent provides strong support for Elize's appellate counsel's actions. In Bethea v. Artuz, 126 F.3d 124 (2d Cir. 1997), the Second Circuit held:

> With respect to the arguments that [the defendant] did not knowingly and voluntarily waive his Miranda rights and that his confession was the product of police coercion, the court conducting the hearing on defendant's pre-trial suppression motion expressly found to the contrary. These findings would have been given great weight on appeal because of the trial judge's peculiar advantages of having seen and heard the witnesses. Appellate counsel was therefore well justified in the decision not to raise these points, and there is little likelihood that raising them would have altered the result.

126 F.3d at 127 (internal quotation and citation omitted).

Elize's appellate counsel argued: 1) that the evidence at trial was "insufficient to prove [Elize's] guilt of the conspiracy charge" and that, in response to two mid-deliberation questions from the jury, the district court erred when it 2) issued a clarification of the law of conspiracy and 3) declined to reveal what language Elize's court interpreter was speaking. People v. Elize, 22 Fed. Appx. 42, 43 (2d Cir. 2001) (unpublished decision). Making these legitimate arguments, though they proved unpersuasive to the Circuit Court, constituted a reasonable strategy.

Elize makes no convincing argument that an attack by appellate counsel on the district court's denial of the motion to suppress evidence and the motion for a new trial would have yielded a reversal. Consequently, Elize's claim of ineffective assistance of appellate counsel fails.

## III.    CONCLUSION

For the reasons discussed above, Elize's petition for a writ of habeas corpus is DENIED.

A certificate of applicability shall not issue.  The Clerk of Court is directed to close this case.

SO ORDERED.


Date:    August 2 2, 2008                    /signed/
         Brooklyn, NY                    NICHOLAS G. GARAUFIS
                                         United States District Judge